March 11, }
  1875.  }               HOLBROOK *v.* FAULKNER.

A school district, being in possession of a school-house, voted to repair it, and to buy land enough to straighten the line west of the school-house. *Held*, that this was a sufficient location to give the county commissioners jurisdiction of a petition to change the location.

The record of the proceedings showing that the petition set forth that the petitioners were aggrieved by the location, and that the commissioners determined to change it, is sufficient without showing in express terms that the commissioners found those facts.

The selectmen, under Gen. Stats., ch. 80, sec. 8, have authority to pay the land damages for the lot, and accept a release for the benefit of the district.

The district neglecting and refusing to take any action in regard to building or removing, the selectmen must determine what the needs of the district require, and build anew or remove the old school-house accordingly.

A school district meeting cannot act excepting upon articles distinctly stated in the warrant.

A selectman, having joined in a remonstrance to the commissioners against taking certain land, and the commissioners having located the school-house upon other land, is not thereby disqualified to act in building a school-house on the lot designated, if the district neglect.

Selectmen have authority, under Gen. Stats., ch. 80, sec. 8, to build a school-house on a lot established by the county commissioners, the district having unreasonably neglected and refused to build.

This is a bill in equity, brought by the plaintiffs, who are voters and tax-payers in Union school district in the village of West Swanzey, against the defendants who are selectmen of Swanzey, to restrain them from assessing and collecting a school-house tax in said district, and building a new school-house therein.

The village of West Swanzey was formerly divided into two school districts, the dividing line being the Ashuelot river; but in 1873 they were, according to law, duly united, forming one district. Prior to this union, each district had a school-house, both of which the district are now using. The larger portions of the voters and of the taxable property are on the east side of the river, and the larger number of scholars are on the west side of said river. At a meeting of the legal voters of said Union district, duly called and holden April 6, 1874, and adjourned to April 22, 1874, the district voted, proper articles for this purpose being inserted in the warrant, " that the school-house be repaired, altered, or enlarged, on such land as is now owned, or may be owned or obtained, by the district, near the church in said district." "Voted, to raise money, not exceeding $3,000, to enlarge and repair the school-house." "Voted, to purchase the land west of the school-house, to straighten the line west of the school-house." A committee was appointed to see if land could be bought to enlarge the lot. The meeting was then adjourned to April 23, 1874, when a building committee was authorized to purchase a strip of land to straighten the west line of said lot, which committee, at an adjourned meeting, reported that they could not purchase said strip. The foregoing votes all related to the school-house on the east side of said river. Afterwards, ten legal voters of said Union district presented a petition to the county commissioners, under the statute, alleging that the district had decided upon a certain location for a school-house; that they were aggrieved by the location of the said school-house in said district;—and another petition was also presented to said commissioners asking them to enlarge the old lot. After due notice and a full hearing on said petitions, the commissioners reported that it would not be for the best interest of the district to take additional land adjoining the present school-house lot by the Baptist meeting-house, but that a new location should be selected ; and they accordingly determined on the following (describing it by metes and bounds), on the west side of the river. In their report the commissioners do not in terms find that the petitioners were aggrieved, or that the district had before that time located a school-house. Some of the plaintiffs appeared at said hearing, by themselves or counsel, and no objection was made to the proceeding.

July 29, 1874, after the commissioners had made their report, a meeting of the district was held. In the warrant therefor there were several articles. The first was as follows: To see if the district will vote to buy of Abraham Stearns the lot designated by the county commissioners for a school-house lot, or take any action in relation to the same. It was voted to dismiss the first article, and pass over all the rest, for the present, up to article 9. These all related to building a

school-house on the lot designated by the commissioners. It was then voted that the district abandon the lot of land designated by the county commissioners as a location for a school-house, as described in their report on file with the clerk, and release any and all right which the district have therein by virtue of the doings of said commissioners, and abandon the same for all school-house purposes. Article 9 was general in its character, and contained no allusion to abandoning the location fixed by the commissioners. After the last meeting above referred to, a large number of the legal voters in said district presented their petition to the defendants, as selectmen, alleging that the district had unreasonably neglected and refused to build a school-house, and praying them to assess a tax and build a new school-house on said lot; and after notice to all parties according to law, and a hearing had upon said petition, the defendants, being of the opinion that the allegations in the petition were made out, and that the district had unreasonably neglected to build a school-house on said lot, decided to grant the prayer of the petition, and assess a tax for that purpose; and they proceeded to take an invoice of the property in said district liable to taxation, and were proceeding to assess a tax for the purpose of building said house, when the bill in this case was filed and a temporary injunction granted.

It appeared, subject to the defendants' objection, that one of the defendant selectmen had, with others, signed a remonstrance which was presented to the county commissioners, remonstrating against taking the land of the Baptist society in connection with the old lot. It also appeared that after the location was fixed by the commissioners, parties interested procured from the owner of the lot selected a release in writing, but not under seal, of all his claim for damages in the same, which was delivered to a majority of the prudential committee and by them accepted, they having no special authority from the district for that purpose; and they left it at the house of the clerk of the district, who refused to receive it, and caused it to be delivered to one Sprague, a member of the district, who, the clerk supposed, had left it there.

Upon the foregoing facts, the court ruled that the bill could not be maintained; to which the plaintiffs excepted. The bill and answer make a part of this case, and may be referred to by either party. The release may also be referred to.

*Wait* and *Hardy*, for the plaintiffs, cited *True* v. *Melvin*, 43 N. H. 506, and *Farnum's Petition*, 51 N. H. 376.

*Wheeler & Faulkner*, for the defendants, cited *Bedel* v. *Stevens*, 28 N. H. 118; Gen. Stats., ch. 35, sec. 2, ch. 79, sec. 1; *Davis* v. *School District*, 43 N. H. 381; *Gordon* v. *Clifford*, 28 N. H. 402; *Rollins* v. *Chester*, 46 N. H. 411.

CUSHING, C. J.   The first objection made is, that there was no location duly made by the district for a school-house, so as to give the commissioners jurisdiction.   This objection seems not well founded.

When the district voted to fit up and repair their school-house, and purchase new land to straighten the line, it would seem that they had as distinctly determined where their school-house should be located as if they had made an express vote. Sec. 6, ch. 80, Gen. Stats., authorizing the selectmen to condemn land for a school-house lot, empowers them to lay out a lot not exceeding half an acre—evidently contemplating that the location designated has not been described by metes and bounds, so that such description does not seem to be necessary.

It is further objected, that the report of the commissioners does not show that the commissioners found, as a fact, that there had been a location, or that the petitioners were aggrieved. The petition alleged that the petitioners were aggrieved by the location, and the commissioners, after due hearing, changed the location; and all this appears of record. As, in fact, there had been a location, and the commissioners determined to change it, it appears to me that the record is sufficient. The whole, taken together, shows substantially that the petitioners alleged that they were aggrieved by the location of the school-house, and that the commissioners found so. The parties have not found it necessary to bring the exact record before the court. Acting upon the information which is given us by the case, it seems that there is enough apparent to show that the commissioners had jurisdiction.

It is further objected, that the district had never acquired any title to the land, and that therefore the selectmen cannot proceed to build. It is true that the statute does not, in express terms, authorize the selectmen to negotiate for the land, or cause it to be condemned, if necessary; but the terms of the statute are broad enough to embrace that power, and it must be understood that it was so embraced, since otherwise the selectmen would be powerless to act in many if not in most cases. If the selectmen would have power to pay the damages, it would seem to follow that they must have power to accept, for the benefit of the district, a suitable release. The fact, if it be so, that the owner of the land is willing to give it, does not make his release less available.

It appears from the case stated, that when the district voted to abandon the location of the commissioners, they had already voted to dismiss the only article under which that subject could have been acted upon. Article 9, under which the vote appears to have been taken, is stated in the case to have been general in its nature, and to have contained no allusion to this subject. No attempt appears to have been made to reconsider the vote dismissing the first article. It is said, also, by the defendants, that the statute does not authorize districts to abandon locations, but only to change them. For both those reasons it appears that the location has not been abandoned.

It is also objected, that a location by the commissioners is not one of the locations mentioned in the statute on which the selectmen may build if the district neglect. It would be a strange result if the law were so left that the district could not in any way be obliged to build a school-house after the commissioners had located it. The statute,

however, appears to treat the commissioners' location as supplementary to and a completion of a process of which the other modes of location may be the commencement. The statutes, being *in pari materia*, must be construed together, and so, if possible, as to give effect to the whole. The proceeding before the commissioners seems to be in the nature of an appeal, and a continuation and completion of proceedings commenced in the other modes,—so that it seems admissible so to construe the statute as to embrace in the term " lot so designated," the lot which is the subject of consideration in this case. It is objected that one of the selectmen had taken some part in preventing the commissioners from taking other land. That question having been determined and a different location established, it is not easy to see how he should have any feeling or any interest. It does not appear that he was a member of the district, or interested in it, but only had an outside interest in land which was not taken. It is difficult to see how this can furnish any reason to the plaintiffs for recusing such selectman. If these views are correct, there is no occasion to interfere with the proceedings of the selectmen, and the bill must be dismissed with costs.

LADD, J.   I also think the bill must be dismissed.

The fact of the existence of a school-house *located* on the east side of the river, taken in connection with the fact of the union of the two districts, and the votes of April 6, 1874, as it seems to me amount to a location by the district of the school-house on the lot east of the river, within the fair meaning of the act of 1871. (Laws of 1871, ch. 4.)

I see no valid objection to the proceedings of the county commissioners in determining the location upon the west side of the river. Their decision as to the location includes the fact that the petitioners were aggrieved. There was no necessity of their reporting that fact. The decision in writing, which they are required to file with the clerk of the district, has reference only to the location.

Whether the act of 1871 is defective in not fixing the length of time for which the decision of the commissioners shall be binding, need not now be inquired. It would doubtless be somewhat anomalous if the decision of a tribunal, invested by law with final and exclusive jurisdiction to determine the location of a school-house, could be overruled and annulled the next day after it is promulgated by a vote of the very majority against whose acts the judgment of such tribunal has been invoked. But whether in the present condition of the statutes on the subject that be so or not, I am of opinion that the judgment of the commissioners establishing the location had not been abrogated by any action of the district at the time this bill was commenced, for both the reasons suggested by the defendants' counsel in their brief: (1) There was no article in the warrant for the meeting of July 29, 1874, under which a vote abandoning the location could legally be had ; (2) if such power exists in the district, which I by no means admit, it can only be exercised by *changing* the location, not by simply undoing what the commissioners have done.

The vote to dismiss the first article in the warrant of July 29 was undoubtedly a sufficient refusal by the district to warrant an application to the selectmen, under ch. 80, sec. 8, Gen. Stats., to say nothing of the neglect inferable from the dilatory proceedings shown by the case. It is said that this section empowers the selectmen to assess a tax and cause a house to be built only on a lot designated as provided in the earlier sections of the same chapter, and does not give them authority to build on a lot designated by the county commissioners according to the act of 1871. The result would be, that a locating by the county commissioners under the act of 1871 is worse than idle and nugatory, inasmuch as it puts it out of the power of the district to provide themselves with a school-house unless a majority shall finally agree to accept the location of the commissioners. For, after a location by the commissioners, they cannot legally build elsewhere; and if there is no way to compel the erection of a building on the lot designated by the commissioners, it clearly follows that the legislature not only very cunningly frustrated the sole purpose of their own act, but put it in the power of the minority in a school district to defeat all efforts of the majority to perform their legal duty in providing a school-house. Nothing short of language most explicit and unmistakable would warrant the court in finding a legislative intent so absurd.

The difficulty all disappears, as it seems to me, if we look at the statutes together. The title of the act of 1871 is, "An act in amendment of ch. 80, Gen. Stats., in relation to school-houses." The whole scope and purpose of sec. 8, ch. 80, is to provide a method for compelling the erection of a school-house on a lot legally designated for that purpose.

The two acts are *in pari materia*, and I think a plain application of a very common rule of interpretation requires us to hold that the provisions of section 8 apply as well to the new mode of designating the lot furnished by the act of 1871, as to modes in existence when the General Statutes were enacted.

The fact that one of the selectmen had signed a remonstrance against taking land of the Baptist society seems to be quite immaterial on the question of his competency to assess the tax.

SMITH, J., concurred.

*Bill dismissed.*